[Crim. No. 7728. Second Dist., Div. Two. Oct. 19, 1961.]

THE PEOPLE, Respondent, v. ROGER DAVID BODKIN, Appellant.

Robert M. Porter and Allan L. Leonard for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant Roger David Bodkin having been convicted after nonjury trial of sale of marijuana to James Franklin Price, a minor of the age of 15 years (Count I), in violation of section 11532 Health & Safety Code, appeals from the judgment and an order denying motion for new trial. Count II of the information charged him with a like offense with respect to Larry Lee Boggs, a minor of 16 years, but he was acquitted of that charge.

Appellant argues that (1) the corpus delicti was not established by competent evidence, (2) the court erred in overruling objections to his alleged confession, and (3) the judgment is unsupported by the evidence and contrary to law. The presentation of these points in his briefs revolves around one main contention, namely, that James Price was the sole witness to the sale, that though he testified on the morning of the first day of trial to facts constituting the offense, he was called to the stand by defense counsel immediately after noon recess and recanted what he had said in the morning, declaring that defendant did not sell him any marijuana cigarettes at any time; that he was lying when he testified that defendant sold him three cigarettes for one dollar. Therefore, says counsel, his morning testimony was perjured (because Price himself said so), and perjured testimony cannot furnish any support to the conviction. But the matter is not that simple. It was for the court, not the witness, to determine whether he perjured himself in the morning or the afternoon. The court found that that occurred in the afternoon. This lay wholly within his prerogative, as the trier of the facts may reject a part of the testimony of a defendant or any other witness while accepting or believing other portions of his testimony. (See *People* v. *Matlock*, 51 Cal.2d 682, 695 [336 P.2d 505]; *People* v. *Davis*, 48 Cal.2d

241, 248 [309 P.2d 1].) This rule applies to testimony which is or is claimed to be perjured.

*Hicks* v. *Ocean Shore Railroad, Inc.,* 18 Cal.2d 773, 780 [117 P.2d 850] : "The reversal of a judgment upon the ground of asserted perjury cannot be ordered except in those cases where the testimony is such as to shock the moral sense of the court. The testimony must be incredible. Where such testimony is not inherently improbable it is the exclusive province of the jury to determine the truth of the matter in question." *People* v. *Coontz,* 19 Cal.App.2d 276, 280 [259 P.2d 694] : "To warrant the reversal of a judgment on the ground of perjury, the testimony attacked must be such as to shock the moral sense of the court. [Citation.] If it fails to do so and its verity is suspected, the finding of the trial court is conclusive, except 'in those rare cases where it obviously appears that the testimony upon which the conviction was had is in and of itself, or when considered in conjunction with the undisputed facts of the case, so inherently improbable as to be impossible of belief, and therefore must be considered to be in effect no evidence at all.' [Citation.] Such inherent improbability must plainly appear before 'the reviewing court should assume the functions of the trial jury.' [Citation.] The revolting character of testimony does not prove that it was inherently improbable that the accused was guilty. [Citation.]" See also *People* v. *White,* 43 Cal.2d 740, 747 [278 P.2d 9] ; *Rolland* v. *Porterfield,* 183 Cal. 466, 470 [191 P. 913].

 Section 2061, subdivision 3, Code of Civil Procedure —"[t]hat a witness false in one part of his testimony is to be distrusted in others"—does not command the rejection of the entire testimony of one who has testified falsely in part. *White* v. *Disher,* 67 Cal. 402, 404 [7 P. 826] : "The truth is not to be rejected, because it passes through a false medium, but as to the existence of the truth the jury is the sole judge."

 *People* v. *Holman,* 72 Cal.App.2d 75, 89 [164 P.2d 297] : "The rule 'That a witness false in one part of his testimony is to be distrusted in others' (Code Civ. Proc., § 2061, subd. 3) 'is one solely for the guidance of the trial court and can have no pertinency in an appellate court.' (*Robinson* v. *Robinson,* 159 Cal. 203 [113 P. 155] ; *Pedrow* v. *Federoff,* 77 Cal.App. 164, 172, 173 [247 P. 212] ; see *Winning* v. *Board of Dental Examiners,* 114 Cal.App. 658, 670 [300 P. 866].) The jury might have rejected all her testimony had they seen fit,

in view of her admitted contradictions, but they were not *bound* to do so. Such 'testimony is still evidence in the case which they must receive and weigh. While they may reject it, they may, as they determine, accept as true one of the contradictory asseverations.' " At page 90: "In *People* v. *Avena,* 34 Cal.App. 500 [168 P. 148], the prosecuting witness and her sister both admitted that their testimony at the trial was directly contrary to that given by them at the preliminary examination, and was false. Their explanation of the change was that they had been told that if their father was convicted he would be sent to the penitentiary and they to the detention home or reform school. The court said: 'It was for the jury to decide whether these contradictory statements, under all the circumstances and facts placed before the jury, so far impeached these witnesses as to render their testimony at the trial improbable or unbelievable. (*People* v. *Preston,* 19 Cal. App. 685 [127 P. 660].)' "

Appellant's reply brief relies upon *People* v. *Casillas,* 60 Cal.App.2d 785 [141 P.2d 768], but that is one of the exceptional cases in which the appellate court can see that the evidence below was no evidence at all. At page 794, the *Casillas* opinion says: "In whatever light the testimony of the prosecutrix is viewed, it must be conceded that her testimony was, in one part or another, perjurious. She gave three separate, distinct and contradictory versions as to who ravished her and the circumstances surrounding the commission of the offenses. . . . [I]t is axiomatic as well that an appellate court may set aside the findings of the trial court when there is no substantial or credible evidence in the record to support them or where the evidence relied upon by the prosecution is apparently so improbable or false as to be incredible. When a case presents any of these features, this court deals with it as a matter of law.

"That such a situation only presents itself in extreme cases we may concede, but we are convinced that the case at bar does not present the usual and ordinary situation where the evidence was in conflict as to the main or only issue, but on the contrary, tenders to us a case wherein the evidence is so lacking in substantiality as to truth or credibility that it falls far short of that quantum of verity, reasonableness and substantiality required by law in criminal cases to satisfy the reason and judgment of those bound to act conscientiously upon it as to the existence of guilt beyond a reasonable doubt and to a moral certainty. It must, therefore, be regarded as

amounting to no evidence at all, as a matter of law, sufficient to overcome the presumption of innocence and to meet the burden resting upon the prosecution to establish guilt beyond a reasonable doubt.''

This and similar cases are thus distinguished in *People* v. *Moore,* 81 Cal.App.2d 799, 802 [185 P.2d 32] : *"People* v. *Headlee,* 18 Cal.2d 266 [115 P.2d 427], *People* v. *Casillas,* 60 Cal.App.2d 785 [141 P.2d 768], *People* v. *Bales,* 74 Cal. App.2d 732 [169 P.2d 262], relied on by defendants, are each factually distinguishable from the instant case. In each of the cited cases the court held that the evidence relied upon by the prosecution was so improbable as to be incredible and therefore the evidence did not support the judgments of conviction. In the present case it is patent in view of the prosecutrix's testimony, supported by the voluntary confessions of defendants, that the evidence is not inherently improbable and therefore it supports the verdicts of the jury.'' That is the situation at bar.

The transcript discloses that the original testimony of Price is considerably more credible than his recantation, that the latter is the perjury. In effect the trial judge so held. He said, with respect to the afternoon testimony, that ''there wasn't any explanation given to me for that great change.'' Also: ''Mr. Leonard said that it was the hand of God intervening, that he would admit that he had perjured himself so suddenly. I agree it is very unusual. . . . These admissions and confessions, of course, are very damaging to the defendant and they are logical; they fit in with the first story from Mr. Price, and I personally can't put any credit at all or any value, as far as the People are concerned, in the statements of Conneally and Boggs. . . . However, I find he is guilty and I find this from the confessions and admissions and the statements on the tape recording, and also I consider the fact that he didn't testify as somewhat damaging to his position.'' As the court said, the admissions and confessions of defendant are logical and do fit in with the first story told by Price. There are other circumstances which point to the truth of that original story.

Given with apparent reluctance it was this. Price, aged 15, was with Larry Boggs and Dennis Conneally in Lennox Park, in the city of Lennox, at about 4 or 4:30 p. m. on July 5, 1960. He saw defendant (whose age was 19) in his car parked at the curb adjoining the park. Price knew him, having seen him several times before. Price and his two

companions who were just inside the park went over to defendant's car, Price got in and "might have said something to him"; they had a conversation about money and Price gave defendant 79 cents; Boggs and Conneally were also in the car at the time. Defendant walked away and returned in about 15 minutes; asked if he needed more money he said "Yes," so Price gave him a dollar and received change. Defendant left again and returned in 15 minutes; as he walked by Price he sort of nodded and Price followed him over to some trees inside the park; he and defendant had no conversation but he there received three cigarettes which he believed to be marijuana (and which were proved to be such); he thinks Boggs was there too. Defendant smoked one cigarette there but said nothing. They separated and Price gave one cigarette to Boggs, one to Conneally and smoked part of the third one. When he saw officers approaching he wrapped the remaining portion in tin foil and put it in his left shirt pocket. Then he was arrested and the officers, searching with his consent, found the tin foil package in his pocket. Later at the Lennox Police Station Price told Sergeant Bridges, in the presence of defendant who made no denial, that he had bought the cigarette from Roger Bodkin at a cost of one dollar for three of them; that this was at the park and he gave the other two to Larry and Dennis.

Deputy Sheriff Lesnick testified that Sergeant Bridges had arrested defendant previously on a narcotics charge and the officers were investigating some information received from the park superintendent and one of the neighbors. When the officers approached Price and Boggs "they appeared to be under the influence of marijuana." Price, when asked if he had any narcotics, denied it and consented to a search. "I asked him what he had in his hand. He turned red and his eyes opened in amazement and he opened his left hand and I observed six white wrapped cigarettes containing the green leafy material." Lesnick also saw Sergeant Bridges remove the tin foil item from Price's pocket. After Price and Boggs had been arrested and taken to the Police Station several officers returned to the park and arrested approximately 15 people, including defendant, who was in an old brown sedan.

Immediately following Price's testimony in the morning, Boggs, age 15, was called as a prosecution witness. He testified that he saw defendant pull up in his car and park and he also saw Price inside the car; that he himself stood on the running board and defendant said nothing; he and Price did

go near the tree but he did not recall whether defendant was ever near it; that defendant at no time gave him marijuana cigarettes. Referred to his preliminary transcript he denied the statements he made there but the context is not before us. Boggs also said that he told the officers in defendant's presence that he had bought marijuana from him and defendant did not say anything. At this point the prosecution's case on Count II collapsed and the noon recess was taken.

When court convened at 1:30 p. m. counsel for defendant asked and received permission to call a witness out of order. Immediately he called Price who testified that Bodkin did not sell him any marijuana cigarettes at any time and that he lied when he testified to the contrary in the morning; that he did so because he was scared. "THE COURT: And you were scared of being sent back to Juvenile Hall, is that it? THE WITNESS: Yes, I was. Q. BY MR. VEGA: Who told you, you would go back to Juvenile Hall if you didn't tell that story? THE COURT: If anybody. THE WITNESS: Well, nobody told me that, but from the last court I was in concerning Roger, I gave those same statements and today if I told different I would be charged for perjury or whatever you want to call it. . . . Q. Did you talk with the defendant's attorney during the recess? A. Yes, I did. Q. What did he tell you? A. He didn't tell me anything. I told him. Q. What did you tell him? A. When Larry got up here and told you what he stated, I decided to tell the truth." The witness also said that no one threatened him. Under cross-examination he admitted that he gave a signed statement to police on the night of July 5 which contained this: "Then today I bought three joints from Roger Bodkin. I paid him a dollar and give one to Larry Boggs, one to Denny Conneally, and I smoked one myself."

This testimony was given on Friday afternoon and because of the deputy district attorney's plea of surprise the case was continued until Monday, but before court adjourned the following occurred: "MR. LEONARD: In the meantime, your Honor, will you give the protection of the Court to this witness? THE COURT: Yes, such as that is. What is that? MR. LEONARD: Well, give him assurance that he need fear nothing for telling the truth, except the penalty of perjury, and he knows that already. THE COURT: Yes, that is true, certainly. MR. LEONARD: And nobody is to threaten him or try to get his story back in the meantime. THE COURT: Well, I would say this, that the People will have the right to ask him questions. MR. LEONARD: Of course. THE COURT: As they would

of any witness. There hasn't been, as far as I know, any testimony that he was threatened by anybody, but certainly I don't expect he will be; but if people should threaten you on one side or the other, I would expect you to report that. It is not proper to do that, and you certainly should feel free from fear of threats, bodily harm, or being put in jail, except for perjury. MR. LEONARD: The same protection would inure to his stepmother? THE COURT: Oh, yes. Certainly.'' The stepmother had testified only to the boy's age. Over this case there hangs an aura of underworld collusion and intimidation.

Boggs' direct examination having been reopened, he admitted signing a written statement at the Police Station on July 5 which contains the following: ''The first time I used anything was weed about six months ago. I scored from Roger Bodkin. I scored from him four or five times altogether. . . . Jim got his from Roger. He told me that he scored from Roger. They were talking under a tree and when I walked over, Roger left and he showed me the stuff. . . . I scored about four or five joints from Roger for three or four dollars. I scored from Roger last time in the park about a month and a half ago.'' This embraces hearsay, but no objection was made to it and the rule is that when so received hearsay is to be considered and weighed with all the other evidence and given such credence and weight as the trier of fact deems it entitled to have. (See *People* v. *Wade,* 138 Cal.App.2d 531, 533 [292 P.2d 303]; Fricke on California Criminal Evidence [5th ed.], p. 189; Witkin on California Evidence, § 723, p. 751.)

Dennis Conneally testified that he saw defendant, Price and Boggs at the park on July 5 but did not see Price approach defendant or know whether he saw him because the witness was at the other end of the park. In a signed statement given the police he had said that he had given Larry Boggs a dollar the day before; also: ''MR. BRIDGES: Were you present at the transaction between Jim and Larry and Bodkin? MR. CONNEALLY: I was standing away. They got three joints from Roger. MR. BRIDGES: Did you see it? MR. CONNEALLY: No, but I know Jim didn't have any and he was talking to Roger. Then he gave one to me and one to Larry and he took one. We all smoked these cigarettes.'' Asked about that document he said: ''Q. And it reflects what happened at that time, what was asked of you and what you answered? A. Yes, but

I couldn't tell you if Jim got them from Roger because I was away from them.''

Deputy Sheriff Lesnick testified that he, Sergeant Bridges and Deputy Berman had a conversation with defendant, Price, Boggs and Conneally at the Police Station about midnight of July 5 and all their statements were free and voluntary. At that time Price said he had purchased three cigarettes from defendant for a dollar, kept one and gave one to Dennis and one to Larry and they had smoked them at the park; he had snubbed his out when 1 inch was left, wrapped it in tin foil, put it in his pocket and walked away; whereupon the police arrested him and recovered the evidence. Defendant was in the same room about 8 feet from Price at the time and remained mute. Boggs said that he had been in the park with Price who had bought three marijuana cigarettes from Bodkin, had given him one and he had smoked it; also, ''that on several prior occasions, several months prior to the day of the arrest he had purchased marijuana from the defendant; that the defendant had introduced him to the practice of smoking marijuana at the Lennox Park some months prior.'' (Again we have hearsay but received without objection.) Bodkin, about 6 feet from Boggs, said nothing in response to this. Conneally said he had been in the park with Price and Price had bought the three marijuana cigarettes from Bodkin, had given one to him and he had smoked it. That on several prior occasions, several months prior to the day of the arrest, he had purchased marijuana from defendant; that defendant had introduced him to the practice of smoking marijuana at the Lennox Park some months prior. Bridges then asked each boy if everything he had said was the truth and ''[t]hey stated that it had been.'' Bodkin said he had heard all the boys had said; '' 'Is what the boys say true?' And Bodkin said, 'Yes.' He said, 'But I got the marijuana from somebody else and I was just looking around the park and they asked me if I could get some. I got it from a third party,' and that was about all he had to say.'' Lesnick also testified that he had had previous separate conversations with the three boys and each had said substantially those same things.

While the foregoing conversation was occurring between the police, the defendant and the three boys, the same without defendant's knowledge or consent was tape recorded. The tape, which had not been altered, was received in evidence

and played for the judge who considered it for purpose of impeachment and upon the question of probable cause. However, that does not disqualify it as evidence to be considered on this appeal because the major question is whether Price told the truth on the first or second occasion of testifying and the impeachment of the one or the other story bears directly upon the solution of that issue. Lesnick testified that the tape accords with his own recollection of the conversation, and Bridges that it ''exactly depicted what I heard.''

Bridges also said he had a conversation with defendant at the Police Station on July 6 in which defendant said he did not sell marijuana to Price nor had he given any or sold any to Boggs. ''I stated, 'Roger, you have been sitting downstairs overnight. You have had a lot of time to think it over. You heard the boys yesterday. I believe the boys are telling the truth. What about it?' He stated, 'Yes, it is true.' I said, 'Did you sell marijuana cigarettes to James Price?' He stated, 'Yes, I did.' '' The officer said that no force or threats were employed and all statements were free and voluntary. Bridges also had a conversation with defendant on July 6, related as follows: ''THE WITNESS: Mr. Bodkin asked me if I thought he was going to get a long time in jail for doing, for selling cigarettes to James Price, and I stated that I did not know. He asked me if it wasn't a serious offense, and I stated that it was. He asked me on two or three occasions the possible length of time he might have to serve in prison or in jail, and I told him that I did not know, that it did not come under my control. I asked him if he had sold marijuana to Larry Boggs on four or five occasions, and he stated, no. I stated, 'Well, you heard the boys yesterday or last night. I'll ask you, Roger, point blank, did you or did you not at any time sell marijuana cigarettes to Larry Boggs?' And he stated, 'I gave them to him.' ''

Defendant did not testify. His defense consisted of the following. Marjorie Melton, age 14, said she was a social acquaintance of defendant, saw him in his car parked in front of the park on July 5 at about 12:30 p. m.; she and two other girls got into the car. She knows Price and saw him after that as he and Larry left the park. A white Oldsmobile was parked behind defendant's car and the two boys were near it. She did not see defendant hand anything to Price or Boggs. She was not with defendant or Price from 12 to 4:30 p. m.

Mary Welch, age 14, knows defendant, used to go to the

beach with him and others. She saw him on July 5 and she and Marjorie sat in the car with him. She saw Price inside the park but not with defendant. He was parked at the curb and a white car was parked behind his. She saw Price and Boggs near the white one. She was there from 12 or 12:30 until she was arrested at 5 o'clock.

Michael Cabral, age 21, testified he knows the defendant and saw him at the park on July 5.

Price, recalled by defendant and obviously referring to his written statement, said he understands the word "voluntarily," has an idea of "immunity" but does not know the meaning of "coercion."

Jerri Owen, per stipulation, would have testified that he stayed the night of the 4th at defendant's house, and at about noon went in defendant's car to the park where they were parked from 12:30 to 1 p. m.; then defendant went into the park on foot, they went back to defendant's place, got Owen's car and went to Sandra Shaw's, this at about 2 p. m. He saw defendant back at the park at 4:30 and at 5 o'clock saw him talking to the arresting officers.

A sorry defense. Defendant did not testify, apparently electing to rely upon the perjury of Price as basis for acquittal. That was his right but he must exercise it *cum onere,* and when it developed that the perjury lay in the testimony favorable to himself it was incumbent upon him to testify or suffer the adverse inferences normally flowing from his silence.

*People* v. *Adamson,* 27 Cal.2d 478, 488 [165 P.2d 3] : "It is clear from the terms of the constitutional provision that the consideration and comment authorized relates, not to the defendant's failure to take the stand, but to 'his failure to explain or deny by his testimony any evidence or facts in the case against him' whether he testifies or not. The constitutional provision thus makes applicable to criminal cases in which the defendant does not testify, the established rule that the failure to produce evidence that is within the power of a party to produce does not affect in some indefinite manner the ultimate issues raised by the pleadings, but relates specifically to the unproduced evidence in question by indicating that this evidence would be adverse." *People* v. *Glass,* 181 Cal.App. 2d 549, 555 [5 Cal.Rptr. 289] : "Defendants had an opportunity to explain their actions and justify their conduct but they chose not to do so. They cannot complain that the court concluded that they could not justify their actions." *People* v. *Williams,* 151 Cal.App.2d 173, 189 [311 P.2d 117] : "Defend-

ant was not called to the witness stand. While this fact alone could not fill any hiatus in the proof of the prosecution, it nevertheless lends weight to evidence presented by the State upon matters presumptively within defendant's knowledge and which, if untruly stated, would normally be denied by him."

The evidence amply sustains the finding of guilt upon Count I of the information.

Appellant argues error in overruling his objections to receipt in evidence of the tape recording of his confession, basing the contention upon the circumstances that the police officers who made the recordings did so without informing him of the fact and without telling him he was entitled to the services of an attorney; also that it is circumstantially shown that his statements were not freely or voluntarily made.

On the last mentioned point counsel quotes *People* v. *Simmons*, 28 Cal.2d 699, 719 [172 P.2d 18], wherein Mr. Justice Carter said: "[C]ertainly the fact that the accused is under arrest or any other form of restraint should be an important factor pointing to inadmissibility." But the court later, in *Rogers* v. *Superior Court*, 46 Cal.2d 3, 10 [291 P.2d 929], rejected the federal rule of *McNabb* v. *United States*, 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819], and held that the fact of incarceration at the time of confession or undue delay in taking the prisoner before a magistrate is "only one of the factors to be considered in determining whether the statement was voluntarily made," saying at page 10: "The test ordinarily used by state courts to determine the admissibility of a confession is, whether, considering all the circumstances, it was freely and voluntarily made without any inducement held out to the accused. (See 19 A.L.R.2d 1332, 1336-1346; 20 Am.Jur., Evidence, § 482.) Since the *McNabb* case, the state courts that have had occasion to reevaluate their test of admissibility as it applies to a confession made during illegal detention continue to treat delay in arraignment as only one of the factors to be considered in determining whether the statement was voluntarily made. Apparently none of the states following the rule excluding illegally obtained evidence have adopted the rule of the *McNabb* case; and we are not disposed to adopt it." Mr. Justice Carter, who wrote the opinion in *Simmons*, dissented from the *Rogers* ruling. Fricke on California Criminal Evidence, fifth edition, page 64, says: "The mere fact that the defendant was under arrest and in the custody of officers of the law at the time the defendant made

a confession does not affect its admissibility [citing numerous cases]."

Failure to advise defendant of a right to counsel does not invalidate a voluntary confession. *People* v. *Tipton,* 48 Cal.2d 389, 393 [309 P.2d 813] : "[A] confession is not rendered inadmissible by a failure to advise a suspect of his right to remain silent, of his right to counsel and that his statements may be used against him [citation], or by an absence of a suspect's counsel and friends [citation], or by a delayed detention, where the confession is not the product of that detention [citation] or by a low emotional and mental stability on the part of the suspect if he is nevertheless capable of understanding the meaning and effect of his confession [citation]. Such matters may be taken into consideration in determining whether a particular confession was voluntarily made." To the same effect see, *People* v. *Hoyt,* 20 Cal.2d 306, 314 [125 P.2d 29]; *People* v. *Kendrick,* 56 Cal.2d 71, 83 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Dossett,* 175 Cal.App.2d 612, 613 [346 P.2d 436]; *People* v. *Encinas,* 186 Cal.App.2d 12, 18 [8 Cal.Rptr. 624].

The police officers testified to the voluntary and free nature of defendant's statements and his own effort to establish the contrary at the trial was weak. The finding is well supported in this regard. "The conclusion of the trial court with respect to the voluntary character of a confession will not be disturbed on appeal in the absence of a clear abuse of discretion." (*People* v. *Kendrick, supra,* 56 Cal.2d 71, 86.)

Making a recording of defendant's confession and admissions without his knowledge is no more an invasion of his rights than it would be to stand outside the window and listen (*People* v. *Cotta,* 49 Cal. 166, 169; *State* v. *Behringer,* 19 Ariz. 502 [172 P. 660, 661]; *People* v. *Van Eyk,* 56 Cal. 2d 471, 477 [15 Cal.Rptr. 150, 364 P.2d 326]), or to listen through a telephone extension (*People* v. *Pustau,* 39 Cal.App. 2d 407, 414 [103 P.2d 224]; *United States* v. *Guller* (D.C. Pa.) 101 F.Supp. 176, 178), or listen through a detectaphone placed against the outside of an office wall, as in *Goldman* v. *United States,* 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322], *People* v. *Graff,* 144 Cal.App.2d 199, 202-205 [300 P.2d 837], *People* v. *Anderson,* 145 Cal.App.2d 201, 205 [302 P.2d 358], or enter a suspect's place of business or elsewhere engaging him in an incriminating conversation and through a concealed microphone transmit it to another person outside who is equipped with a receiving set, as in *On Lee* v. *United States,*

343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270]. To the same effect see, *People* v. *Collins,* 80 Cal.App.2d 526, 536 [182 P.2d 585]; *People* v. *Pustau, supra,* 39 Cal.App.2d 407, 414. In the following cases the use of a secret sound recording device was specifically upheld, viz: *People* v. *Sica,* 112 Cal. App.2d 574, 586 [247 P.2d 72]; *People* v. *Avas,* 144 Cal.App. 2d 91, 99 [300 P.2d 695]; *People* v. *Goldberg,* 152 Cal.App.2d 562, 573 [314 P.2d 151]; *People* v. *Albert,* 182 Cal.App.2d 729, 736 [6 Cal.Rptr. 473].

Finally, there could be no prejudicial error in this matter for Officer Bridges testified that he was present during the recording and the tape as played "exactly depicted what I heard." This conversation was primary evidence despite the fact that it was recorded (*People* v. *Sica, supra,* 112 Cal.App. 2d 574, 588); and it was received in evidence without objection (see *People* v. *Millum,* 42 Cal.2d 524, 526 [267 P.2d 1039]; *People* v. *Johnson,* 187 Cal.App.2d 116, 124 [9 Cal. Rptr. 571]).

Judgment and order affirmed.

Fox, P. J., and Herndon, J., concurred.